## THE ELDORADO.[1]

### STARIN'S CITY, RIVER & HARBOR TRANSP. CO. *v.* THE ELDORADO AND TWO STEAM-TUGS.

#### (*District Court, E. D. New York.* July 17, 1891.)

1. COLLISION—NEW YORK HARBOR—SPEED NEAR PIER LINE.
   The steam-ship Eldorado, coming in from sea, was proceeding near the New York piers towards her slip, when she collided with a railroad float, moving out from the docks in charge of two tugs. *Held*, that if it were the fact, as the master of the steam-ship testified, that the heavy float moved out 921 feet after he first saw her coming past the end of the lower pier, the inability of the steamer to come to a stop showed that she was moving at too high a rate of speed; if, on the other hand, the evidence for the float was true that it was struck when only one-third of its length outside the pier, it showed that the steam-ship was running too near the piers; and, on either hypothesis, the steamer should be considered in fault.

2. SAME—TOWING OUT OF SLIP—NEGLIGENCE—LOOK-OUT.
   The tugs in charge of a railroad float were held in fault for taking the float out of a slip into the North river without first observing whether any boats were approaching along the docks, without giving any warning whistle, and at a time when the fog in the air was such as to induce vessels in the river to run near the docks, by reason of which neglect the float was struck by a steamer which had been coming up stream near the piers, in plain sight.

In Admiralty. Suit to recover damage caused by collision.

*Carpenter & Mosher,* for libelant.

*Chas. H. Tweed,* (*Robert D. Benedict,* of counsel,) for the Eldorado.

BENEDICT, J. This action is brought by the owner of a float used in transporting railroad cars about the harbor of New York, known as "D. L. & W. No. 5," to recover the sum of $30,000 as damages caused by a collision between that float and the steam-ship Eldorado on the evening of October 23, 1888. The steam-ship Eldorado, bound from New Orleans to New York, on the evening of October 23, 1888, arrived in the harbor of New York, in a fog that bid fair to compel her to anchor. In the neighborhood of 5 o'clock in the afternoon, however, the fog lifted so that lights could be seen distinctly, and the steamer proceeded towards her pier at the foot of Charlton street, in the North river. The tide was ebb, and the steam-ship, anxious to reach her pier before night-fall, and to hold the city lights in case the fog should drop again, pressed on up the North river, keeping close to the piers on the New York shore. When she had reached as far up as between pier 18 and pier 20, she encountered

[1] Reported by E. G. Benedict, Esq., of the New York bar.

the floa. D. L. & W. No. 5, moving out into the river; and, before the steamer could be stopped, she struck the float a heavy blow on the lower side, (or port side, as the float was going,) cutting into her some five feet. The large amount of damage that ensued resulted from the fact that the collision caused the float to dump into the river the railroad cars she had on board. The float was at the time of the accident being moved out from the bulk-head between pier 18 and pier 19, North river, into the North river, by two tugs, one the W. H. Vanderbilt, and the other the James H. Langston. The course given the float by these tugs was out from the piers, while the course of the steamer was parallel to the ends of the piers An examination of the testimony has convinced me that this disastrous collision should be attributed to fault on both sides. The fault on the part of the steamer consisted in running so near the piers as she did, at the rate of speed that she carried. I entertain no doubt that, when the steam-ship discovered the float moving out from the end of pier 18, the course the steamer was then upon would have carried her outside, and clear of pier 20, which pier extends 221 feet outside of the end of pier 18. From the bulk-head where the float started to the end of pier 18 is about 480 feet. The float was seen by the master of the steam-ship as soon as her end appeared at the end of pier 18, and, as the result shows, it was not then possible for the steamer to be brought to a stop before she reached the course of the float. As to the distance outside pier 20 reached by the float when she was struck, the testimony is conflicting. According to the testimony of the master of the steamer, the float when struck was some 700 feet outside of the line of the end of pier 20, and in the strength of the ebb-tide. According to the testimony in behalf of the float, the float when struck was no more than one-third of her length outside the line of the end of pier 20. If, as the master of the steamer says, the float moved out 921 feet after she was seen by him before she was struck, the fact that it was impossible to bring the steamer to a stop while this heavy float, at her slow rate of moving, ran that distance, shows that the steam-ship was going at too high speed. If, on the other hand, as witnesses for the float say, the float, when struck by the steamer was only one-third her length beyond the end of pier 20, that fact shows the steam-ship in fault for running too near the piers. Eighty feet from the ends of the piers is too near for a steamer like the Eldorado to be going, at even five miles an hour, which is the speed her master gives her. The fault on the other side is as clear, for this heavy float was put, without notice by whistle, directly under the bows of the Eldorado, at that time plainly visible, coming up the river from below, and so close at hand that collision was inevitable, unless the float should be kept back out of the steamer's way. The float would not have been placed in this dangerous position had proper attention to the condition of the river been paid by those engaged in handling her. No attention whatever seems to have been paid by them to what was occurring in the river below them, and the presence of the steamer was unknown until she was upon them. The only person on the float says that he did not see the steamer until she was within 15 or 20 feet of him. When those

on the Vanderbilt saw the steamer she was already off the Cortlandt-Street ferry, and then she was seen only because they "happened to look that way." The steamer was not more than 250 feet away when she was first seen by the tug Langston, then fast to the float on the lower side. No one on either tug or on the float heard the whistles of the Eldorado, which are proved by the testimony of many witnesses to have been blown. This careless method of putting a float like this out into the river was used when the condition of the fog was such as to induce vessels to run near the piers, (where it was seen that the steam-boat Starin was running,) and for that reason special watchfulness was required. The testimony makes it plain that this unwieldy float was moved out into the stream from pier 18 without any watchfulness whatever, at a time when any attempt to move her out ahead of the steamer, then coming up, was attended with danger of collision. That proper attention on the part of those responsible for the movements of the float would have avoided collision is shown by the fact that, when the Eldorado came up by pier 16, another float was being moved out into the stream from that pier by the tug Columbia; but, the steamer being seen, collision with her was avoided by timely efforts on the part of the Columbia, although the steamer came on without change of course or slacking of speed. For these reasons, my conclusion is that the damages resulting from this collision must be apportioned. The tug Vanderbilt has been made a party to the action upon the petition of the steamer, and the tug Langston is lost; but, inasmuch as the tugs and the float were owned by the same owners, it is, I suppose, unnecessary to distinguish between the liability of the float and the liability of the Vanderbilt.